**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

STACEY D. BOGGS,
                    **Plaintiff,**

v.                                                          **CIVIL ACTION NO. 5:07CV10**

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,
                    **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross

Motions for Summary Judgment and has been referred to the undersigned United States Magistrate

Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

### I. Procedural History

Stacey D. Boggs ("Plaintiff") filed her application for DIB on January 12, 2005, alleging

disability as of December 3, 2003, due to a tumor in the pelvis (R. 55, 98). The application was

denied initially and on reconsideration (R. 29, 30). Plaintiff requested a hearing, which

Administrative Law Judge ("ALJ") Norma Cannon held on April 17, 2006 (R. 391). Plaintiff,

represented by counsel, testified along with Vocational Expert Larry Bell ("VE"). The ALJ rendered

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

a decision on July 19, 2006, finding that Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (R. 20). Plaintiff submitted new evidence to the Appeals Council, which denied her request for review on November 17, 2006, making the ALJ's decision the final decision of the Commissioner (R. 6).

## II. Statement of Facts

Plaintiff was born on June 1 1971, and was 35 years old on the date of the ALJ's decision (R. 73). She graduated from high school and had two-plus years of college in criminal justice and communications, before becoming licenced to sell insurance (R. 396). She sold insurance for the past several years. Her alleged onset date is December 2003, when she stopped working and went on medical leave (R. 99, 398).

Sometime in October 2003, Plaintiff began having trouble with pain and weakness in her left hip, which continued to progress (R. 368). She was initially treated for sciatica, but the pain did not resolve. Plaintiff's treating oncologist/orthopedic surgeon noted in July 2004, that there had been radiographic evidence of a lesion of her ischium as early as December 2003 (R. 202). In another report dated June 24, 2004, the treating oncologist/orthopedic surgeon reviewed x-rays and stated: "X-rays reviewed today include films from December compared to June 7. The films reviewed in December showed a lytic lesion in the left inferior rami" (R. 369).

A February 26, 2004, MRI of the lumbar spine showed early degenerative change at the L4-5 level with no stenosis or herniation identified, but with facet joint hypertrophy seen (R. 252).

In June 2004, an MRI of Plaintiff's pelvis showed a very large obstructive lesion from just lateral to the inferior pubic ramus up into the posterior column of the acetabulum. There appeared to be a pathologic fracture. The possibility of metastatic disease was a strong consideration. Dr.

Mark Goodman, M.D., Plaintiff's treating oncologist/orthopedic surgeon stated:

> There is an aneurysmal lesion with thinning of bone and almost complete destruction of the inferior rami on the left. The CT scans shows (again) aneurysmal lytic lesion in the left inferior rami. There is a thin rim of bone around this lesion.

(R. 369). At the time Plaintiff was diagnosed with bone cancer.

A few days later, Plaintiff was transported to the emergency room due to chest pain and shortness of breath (R. 234). She first believed the symptoms were a reaction to her new medications, but then later believed she may have just "panicked" over her diagnosis of cancer. Tests and studies were normal. She discussed how frightened she was for herself and her young child. She was diagnosed with chest pain and shortness of breath secondary to anxiety (R. 235).

Plaintiff underwent a biopsy of her hip bone, which showed a soft tissue mass that had giant cells but numerous atypical cells as well. The surgeons stopped the biopsy at the time, to be performed at a later date, so as "to not lose the opportunity to resect properly" (R. 202).

Plaintiff underwent further surgery for biopsy on July 3, 2004. It was determined she had a very large aneurysmal bone cyst with large soft tissue expansion (R. 210). There was no evidence of malignancy.

Plaintiff was re-admitted to the hospital on July 20, 2004, for resection of the left ischium, curettage, and cementation of the left posterior acetabulum. She was discharged from the hospital three days later, with instructions to return to normal activities with the exception of driving or returning to work until okayed by Dr. Goodman (R. 210).

On August 27, 2004, Plaintiff presented to her regular treating physician relating that she had been very depressed (R. 231). She had been driving with her young son and thought about driving off a cliff. She did not follow through because her son was in the car. She had adamantly denied

3

being depressed only a few days earlier, telling the physician she was just very weak, and possibly needed a blood transfusion. She also had intermittent episodes of nausea, vomiting and diarrhea, losing four pounds in three days, and 20 pounds since her surgery. She now believed the doctor was correct and she was perhaps suffering from depression.

Plaintiff was admitted to the hospital with diagnoses of gastroenteritis, severe depression, anxiety, and insomnia, in addition to being status post-surgery (R. 232). Upon psychiatric evaluation, she was found to have depression, with crying, suicidal thoughts, and decreased memory. Plaintiff was alert and crying, and stated she could not tolerate life anymore and was tired of being sick. Upon physical examination she had decreased motor strength of the left leg. She had increased lethargy, weight loss, anorexia, and anxiety, with headache, nausea, vomiting and diarrhea. She was prescribed Ativan and Effexor, but the doctor did not want her to leave the hospital until she saw a psychiatrist, "to make sure she is not suicidal."

On October 3, 2004, Plaintiff presented to the medical center with right hand and arm pain for several days (R. 229). She was concerned she might have a tumor in the bone of her forearm. X-rays were unremarkable, but there was the possibility she had carpal tunnel syndrome. She was discharged home with a prescription for Percocet for pain and a wrist splint.

On October 28, 2004, Plaintiff followed up with Dr. Goodman (R. 258). He believed she had done well. She was having some very minor discomfort in her knee with activity, but her pelvic pain was gone. She could sit comfortably and walk without any great discomfort. She complained of some numbness in her right arm and discomfort in her left knee.

On January 6, 2005, Plaintiff presented to Dr. Goodman upon referral of her regular physician, Connie Anderson, about a mass in the right side of her back (R. 257). Examination

4

showed a mass at the T11 level. It was mildly tender. The doctor opined it was probably a lipoma or fibroma, and believed it should be removed, which was later done.

On February 8, 2005, Dr. Goodman opined that Plaintiff would have moderate pain with activity, with occasional use of Vicodin (R. 255). She was prohibited from being on ladders, scaffolds, or slippery surfaces, and lifting was limited to 20 pounds occasionally.

On March 24, 2005, Dr Goodman wrote to Dr. Anderson, noting that Plaintiff had recently had a benign lipoma removed, but was now having no problems (R. 367). Plaintiff, however, still complained of left leg and buttock pain, exacerbated by ambulation. Upon examination, Plaintiff had good range of motion of the hip, the incision was well healed, and the hamstring muscles appeared stable. She was neurologically intact. Dr. Goodman believed Plaintiff was doing well from his standpoint.

On August 26, 2005, Dr. Goodman again wrote to Dr. Anderson, noting it had been just about a year since Plaintiff's surgery (R. 366). He noted Plaintiff was having "significant left lower extremity problems," which he felt were more indicative of some low back problems than of persistent pain from her bone cyst. On examination, Plaintiff was tender over the SI joint and left buttock area. She had positive straight-leg raising at about 70 degrees on the left. The hip joint remained good with no progression. There were some degenerative arthritic changes of the knee which were mild to moderate. The doctor informed Plaintiff that her weight was putting her knee at risk. He started her on elavil so she could get some sleep, in the hope that her pain and depression would abate.

On April 1, 2005, State agency reviewing physician Rafael Gomez, M.D., completed a Residual Functional Capacity Assessment ("RFC"), opining that Plaintiff could occasionally lift and

carry 20 pounds, frequently lift and carry ten pounds, stand/walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (R. 265). She could never climb ladders, ropes or scaffolds, balance or crawl, and could only occasionally climb ramps or stairs, stoop, kneel, or crouch. She must avoid concentrated exposure to hazards. The doctor found Plaintiff to be credible (R. 269).

On April 5, 2005, a State agency reviewing psychologist completed a Psychiatric Review Technique ("PRT") of Plaintiff, opining that, although she had a depressive disorder in partial remission, she had no severe mental impairment (R. 272). He felt she had no functional limitations due to mental symptoms (R. 282).

In May 2005, Plaintiff was continuing to complain of knee pain (R. 287). She was diagnosed with a left lateral meniscus tear.

On May 13, 2005, Dr. Goodman wrote a "To Whom It May Concern" letter, stating that Plaintiff had been operated upon on July 3, 2004, and "has had some problems with pelvic floor instability and some problems of chronic pain" (R. 370). She was using Vicodin on an as needed basis and was limited in the type of work she could do. He opined that she could sit and stand, but could not walk great distances; could not do many flights of stairs; could not do a lot or repetitive standing activities; and could not lift or carry anything over eight pounds. She was capable of using her upper extremities.

On May 31, 2005, Plaintiff told her family physician that she was still having a lot of back pain (R. 286). She related that Dr. Goodman had told her she could take Vicodin, but the family physician was concerned with this, noting the addictive nature of the pain medication. Plaintiff stated she was only taking them for pain. The doctor was also concerned that another family

6

member, who was addicted to pain medication, was taking the pills. Dr. Anderson referred Plaintiff for physical therapy.

On July 8, 2005, a State agency reviewing physician completed an RFC of Plaintiff, opining she could lift/carry 20 pounds occasionally and 10 pounds frequently, could stand/walk about six hours in an eight-hour workday, and could sit about six hours in an eight hour workday (R. 311). She must avoid concentrated exposure to vibration and had no other limitations. He found her allegations of limitations, especially of riding a cart to grocery shop, not fully credible.

Plaintiff's administrative hearing was held in April 2006. During the hearing, Plaintiff described her pain as like an ache, sometimes with piercing pain (R. 401). Her legs felt heavy, as if she couldn't lift them. On a bad day, the pain was a level ten, and on a good day, five. On a good day (about two or three days per week) she could prepare dinner and straighten the house. She could sometimes shop and sometimes clean. Her husband often helped her get her pants on and her husband or son helped her tie her shoes. She did not usually do the laundry. Her family sometimes came to visit. She tried to play games with her son, and she did go to some of his school activities.

Plaintiff testified that her hip problems began in about October 2003, when she noticed pain and problems moving her left leg (R. 407). She would have to pick her leg up and put it in the car. She was having trouble walking, could not tie her shoes, and "just really hurt" all the time. She went to the hospital in December 2003, where she was diagnosed with sciatica. By February 2004, she had an MRI for the same symptoms (R. 408). She testified that by this time she had "virtually no movement on the left side [and] just hurt in the pelvic area." She was unable to sit flat for any reason and could not put on her own pants.

She finally went to the emergency room again in June 2004, after which she was finally

correctly diagnosed with a bone tumor/possible bone cancer which had actually caused one of her pelvic bones to thin and fracture. Much of her pelvic bone and hip bone on the left side was replaced with bone cement. She testified that the problems resulted in back and knee problems, with one leg shorter than the other, causing "lopsidedness." She testified that she could not sit, stand or lay for any period of time. She noted that she had been "squirmy" during the hearing, but was "trying not to be." She also testified that her doctor limited her to lifting eight pounds because all the muscles on the back of her leg were cut and reattached and he was afraid of her damaging that.

On May 18, 2006, about a month after her hearing, Plaintiff underwent a whole-body bone scan for her continued left hip and leg pain (R. 371). The impression was abnormal uptake present within the left hip. Possible diagnoses included residual or recurrent malignancy, but the bone scan findings themselves were not specific as to diagnosis.

On June 6, 2006, about six weeks after the hearing, Plaintiff underwent an MRI for pelvic pain, which indicated a right ovarian cyst (R. 372). Two days later, a CT scan confirmed the ovarian cyst, and also indicated:

> Incidental notation is made of some abnormal appearance to the left acetabulum and its junction with the lateral most aspect of the left inferior pubic ramus. This may relate to her known prior history of large cell tumor. Imaging-wise, I cannot distinguish from an old curettaged left-sided giant cell tumor. Please correlate clinically post prior pathology results. <u>There is also notation made of what appears to be a fracture through the superior pubic ramus which may not be completely united. There is sclerosis on both sides of the fracture but the fracture line is still visible through the superior pubic ramus on the left. This theoretically could cause some pain if this was an unstable or only fibrous union.</u> Please correlate with whether or not her pain is anterior or more posterior as it appears to be the posterior portion of the acetabulum is where her presumed tumor was as there is resection of bone there and dense sclerosis which could relate to packing material or postsurgical sclerosis. I do not see convincing evidence for a recurrent mass at this time.

(R. 372)(emphasis added). The Court notes that this record was submitted to the ALJ, who entered

her Decision on July 19, 2006.

## Evidence Submitted to the Appeals Council

On September 1, 2006, Plaintiff, through counsel, submitted new evidence to the Appeals

Council (R. 374). That evidence, which was accepted by the Appeals Council and included in the

record, includes, besides counsel's argument, the following:

On July 26, 2006, Plaintiff's orthopedic surgeon, Mark Goodman, performed another surgery

on Plaintiff's left hip for a diagnosis of "ununited pathologic fracture, left pubis" (R. 380). His

Findings are as follows:

> The patient is a 35-year-old who underwent resection of an aneurysmal bone cyst of
> her ischium and acetabulum. As a result of the stress, she developed a stress fracture
> of the pubis. This has gone on to nonunion and was painful. At surgery, an oblique
> nonunion was found underneath the vessels. The quality of bone surrounding it was
> normal/ there were no other abnormalities noted.

> The disunion was fitted with a pelvic reconstruction plate. A single screw was
> placed through the plate and through the nonunion as a compressive screw. The
> additional five single screws were then placed without difficulty. Plaintiff tolerated
> the procedure well and went to the recovery room in satisfactory condition.

On August 4, 2006, Dr. Goodman noted:

> I spoke with Stacy on August 04, 2006. She has a little bit of green drainage around
> her drain site. The rest of the incision looks good. She is having no problems with
> her abdomen. She is able to get up and around today without a great deal of pain.
> Things seem to be settling down and heading in the right direction.

(R. 382). Dr. Goodman completed a physical RFC on August 23, 2006, based upon his diagnosis

of aneurysmal bone cyst left ischimius and ununited stress fracture left pubis (R. 383). He opined

that Plaintiff could occasionally lift less than ten pounds; could stand/walk less than two hours in

an eight-hour workday; and could not sit for any amount of time, but must periodically alternate

sitting and standing. Dr. Goodman hand wrote in the words "can't sit." His explanation was "pelvic

pain with standing and sitting due to stress fracture." She could never perform any posturals, due to the resection of ischium and pelvic fracture and she must avoid all exposure to hazards, and even moderate exposure to temperature extremes, wetness, humidity, and vibration. She would have limited mobility due to "multiple surgical procedures and scars."

Dr. Goodman finally opined Plaintiff had:

A) Symptoms due to tumor, tumor resection, and subsequent complications

B) Stress fracture has prolonged the disability

C) Patient's life has been significantly altered by this condition.

(R. 388).

On November 17, 2006, the Appeals Council denied Plaintiff's request for review of the ALJ's July 19, 2006, decision, simply stating: "In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision" (R. 6-7).

## Evidence Submitted for the First Time to the Court

In her Memorandum, Plaintiff states that a "Report of Employment Potential" was prepared on February 12, 2007, by a vocational expert, with the general conclusion that due to her pain and limitations, Plaintiff would be unable to return to substantial gainful activity in the future and would also be a poor candidate for vocational retraining due to her documented limitations. Defendant objects to this evidence being considered as not material to the time at issue. The Court finds the new evidence unnecessary to its decision and it was therefore not considered.

10

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since December 31, 2003, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. The claimant has the following severe impairments: aneurysmal bone cyst, status post surgery, with residual pelvic floor instability and pain; degenerative disc disease of the lumbar spine; meniscal tear in the left knee; and right hip SI joint dysfunction (20 CFR § 404.1520(c).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work with a sit/stand option; no more than occasional postural activities except no climbing of ropes, ladders or scaffolds, balancing, or crawling; should avoid vibrations, dangerous machinery and unprotected heights; decreased strength and range of motion of the legs and left hip; and no use of foot pedals.

6. The claimant is unable to perform any past relevant work (20 CFR § 404.1565).

7. The claimant was born on June 1, 1971 and was 32 years old on the alleged disability onset date, which is defined as a younger individual aged 18- 44 (20 CFR § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from December 3, 2003 through the date of this decision (20 CFR 404.1520(g)).

(R. 15-20).

## IV. DISCUSSION
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.    The Appeals Council and the ALJ failed to properly weigh the opinions of Mrs. Boggs' treating physicians;

2.    The ALJ committed reversible error when he [sic] based his [sic] denial on Mrs. Boggs' performance of some daily activities; and

3.    The ALJ improperly applied "sit and squirm" jurisprudence to the Plaintiff's testimony as she sat through the hearing.

Defendant contends:

1.    Substantial evidence supports the ALJ's finding that Plaintiff could perform the sedentary work identified by the VE;

2.    The Appeals Council did consider the new evidence, but nevertheless properly concluded that it did not provide a basis for changing the ALJ's decision;

3.    The ALJ properly considered the opinions of Dr. Goodman, but nevertheless gave Dr. Goodman's 2005 opinion less weight in accordance with the regulations;

4.    Plaintiff's daily activities provide ample support for the ALJ's determination that she can perform the minimal physical demands of the sedentary jobs identified by the VE; and

5.    "Plaintiff's argument that the ALJ improperly applied 'sit and squirm' jurisprudence requires little discussion . . . .The simple fact is that the ALJ observed Plaintiff sit though[sic] an hour-long hearing . . . ."

## C. Appeals Council Decision

Plaintiff first argues that the Appeals Council ignored the new evidence submitted by

Plaintiff post-ALJ decision. Defendant contends that the Appeals Council did consider the evidence, but properly found it did not provide a basis for changing the ALJ's decision. Pursuant to 20 CFR § 404.970(b), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Wilkins v. Secretary, Dept. of Health and Human Services, 953 F.2d 93, 96 (4th Cir. 1991). Evidence is not "new" if other evidence specifically addresses the issue. See Id. at 96. In this case, the Appeals Council itself stated that it had considered the new evidence – Medical and radiology reports from Dr. Goodman, dated from 7/06 to 8/06 – but "found that this information does not provide a basis for changing the Administrative Law Judge's decision" (R. 6-7).

The Appeals Council did not further explain its determination, nor, as this Court has consistently found, was it required to. There is a conflict among the district courts within the Fourth Circuit in this regard, however. In Alexander v. Apfel, 14 F. Supp. 2d 839 (W. D. Va. 1998), the Western District of Virginia held that the Appeals Council erred by not providing the reasoning for its determination. First, however, the regulations do not require the Appeals Council to state its rationale for denying review. See 20 C.F.R. § 404.970(b). Second, as a decision from another district, Alexander is of questionable precedential value. Third, in an unpublished opinion decided after Alexander, the Fourth Circuit specifically rejected the contention that the Appeals Council must articulate its own assessment of the additional information. See Hollar v. Commissioner of Social Security, 194 F.3d 1304 (4th Cir. 1999)(unpublished), cert. denied, 120 S. Ct. 2228 (2000) (citing Browning v. Sullivan, 958 F. 2d 817 (8th Cir. 1992), 20 C.F.R. § 404.970(b)). cf., Harmon v. Apfel, 103 F. Supp. 2d 869 (D.S.C. 2000) (court declined to follow Hollar and instead required the Appeals

Council to articulate its reasoning in declining review where new evidence was submitted.). Finally, a subsequent decision in the Western District of Virginia concluded the exact opposite of the magistrate judge in Alexander. In Ridings v. Apfel, 76 F. Supp. 2d 707 (W.D. Va. 1999), which was decided after Alexander, District Judge Jones held that the Appeals Council was not required to state its reasons for finding that the new evidence did not justify review of the ALJ's decision. Judge Jones expressly disagreed with the magistrate judge's reasoning that the Appeals Council must give a detailed assessment of its failure to grant review in the face of new evidence, citing Hollar.[2]

Despite holding that the Appeals Council was not required to articulate its reasoning for denied review, Judge Jones affirmed the magistrate judge's recommendation that Ridings' claim be remanded to the Commissioner, because "substantial evidence [did] not support the ALJ's decision, when reviewed along with [the new evidence]." Id. at 709. Further, in Hollar, the Fourth Circuit found:

> The magistrate judge correctly analyzed the entire record [and] found that substantial evidence supported the Commissioner's decision and that the additional evidence submitted to the Appeals Council did not change that finding . . . .

Id. (Emphasis added).

Therefore, the undersigned will consider the entire record, including the new evidence submitted to the Appeals Council, to determine if the decision of the ALJ is supported by substantial evidence.

Plaintiff filed her application for DIB on January 12, 2005. ALJ Cannon held the administrative hearing on April 17, 2006. On May 18, 2006, Plaintiff underwent a whole body bone

---

[2]Judge Jones did cite Alexander in a footnote, stating: "At least one other magistrate judge of this district has held that the Appeals Council must articulate some reason for finding that the new evidence does not justify review." Id. at n.6.

scan in response to her complaints of continued leg and hip pain. It showed "nonspecific uptake" within the area of her earlier surgery, which "could represent residual or recurrent malignancy [or] postsurgical changes." On June 8, 2006, six weeks after the hearing, a CT scan indicated:

> Incidental notation is made of some abnormal appearance to the left acetabulum and its junction with the lateral most aspect of the left inferior pubic ramus. This may relate to her known prior history of large cell tumor. Imaging-wise, I cannot distinguish from an old curettaged left-sided giant cell tumor. Please correlate clinically post prior pathology results. There is also notation made of what appears to be a fracture through the superior pubic ramus which may not be completely united. There is sclerosis on both sides of the fracture but the fracture line is still visible through the superior pubic ramus on the left. This theoretically could cause some pain if this was an unstable or only fibrous union. Please correlate with whether or not her pain is anterior or more posterior as it appears to be the posterior portion of the acetabulum is where her presumed tumor was as there is resection of bone there and dense sclerosis which could relate to packing material or postsurgical sclerosis. I do not see convincing evidence for a recurrent mass at this time.

(R. 372)(emphasis added). The undersigned notes that these records were submitted to the ALJ. The ALJ rendered her decision on July 19, 2006, noting that Plaintiff recovered very well after her 2004 surgery.

Plaintiff herself reported on October 28, 2004, that her pelvic pain was gone. She could sit comfortably and walk without any great discomfort. By March 24, 2005, however, Plaintiff's treating physician reported that Plaintiff complained of left leg and buttock pain, exacerbated by ambulation. On August 26, 2005, he reported that Plaintiff was having "significant left lower extremity problems," which he felt were more indicative of some low back problems than of persistent pain from her bone cyst. On May 13, 2005, he stated that Plaintiff "had some problems with pelvic floor instability and some problems of chronic pain."

The new evidence shows that on July 26, 2006, only two months after the hearing and only one week after the ALJ's decision, Plaintiff's treating orthopedic oncologist performed another

surgery on Plaintiff's left hip for a diagnosis of "ununited pathologic fracture, left pubis." His

Findings are as follows:

> The patient is a 35-year-old who underwent resection of an aneurysmal bone cyst of her ischium and acetabulum. As a result of the stress, she developed a stress fracture of the pubis. This has gone on to nonunion and was painful. At surgery, an oblique nonunion was found underneath the vessels. The quality of bone surrounding it was normal/ there were no other abnormalities noted.

> The disunion was fitted with a pelvic reconstruction plate. A single screw was placed through the plate and through the nonunion as a compressive screw. The additional five single screws were then placed without difficulty. Plaintiff tolerated the procedure well and went to the recovery room in satisfactory condition.

(Emphasis added). This treating physician also completed a physical RFC on August 23, 2006,

based upon his diagnosis of aneurysmal bone cyst left ischimius and ununited stress fracture left

pubis (R. 383). He opined that Plaintiff could occasionally lift less than ten pounds and could

stand/walk less than two hours in an eight-hour workday. He did not check off any amount of time

she could sit, instead checking the box indicating she must alternate sitting and standing. He

expressly wrote: "can't sit." His explanation for these limitations was "pelvic pain with standing and

sitting due to stress fracture." (Emphasis added). He opined that she could never perform any

posturals, due to the resection of ischium and pelvic fracture; she must avoid all exposure to hazards,

and even moderate exposure to temperature extremes, wetness, humidity, and vibration. She would

have limited mobility due to "multiple surgical procedures and scars."

This treating physician determined that Plaintiff had:

A) Symptoms due to tumor, tumor resection, and subsequent complications

B) Stress fracture has prolonged the disability[; and]

C) Patient's life has been significantly altered by this condition.

(R. 388).

17

Defendant argues: "At best, this evidence shows only a subsequent deterioration of a preexisting condition. In such a case, it is not material to Plaintiff's current claim for benefits, which was closed as of the date of the ALJ's decision . . . ." (Defendant's Brief at 10-11). The undersigned disagrees. Plaintiff clearly did not suffer a "painful" "nonunion" of her left pubis one week after the ALJ's decision. The bone scan and CT scan prior to the date of the administrative hearing, although not determinative at the time, are clear evidence of the nonunion. The bone scan, in turn, was performed due to Plaintiff's continued and consistent complaints of leg and hip pain, starting at least a year earlier.

Defendant further argues:

> [Dr. Goodman's] physical residual functional capacity assessment . . . was performed less than a month after Plaintiff's July 26, hip surgery. Consequently, these limitations were given during Plaintiff's recovery period following surgery when a reduced functional capacity would be expected. There is no evidence, however, to indicate that Plaintiff was so severely limited prior to surgery or that these restrictions would be expected to continue for twelve months following the July 2006 surgery.

(Defendant's Brief at 10). Dr. Goodman, however, did not base his RFC on Plaintiff's 2006 surgery. Instead, he expressly based it on Plaintiff's "multiple surgical procedures and scars." (Emphasis added). He also concluded that Plaintiff's symptoms were "due to tumor, tumor resection and subsequent complications;" that "stress fracture has prolonged the disability;" and that Plaintiff's "life has been significantly altered by this condition." (Emphasis added).

The ALJ found Plaintiff only partially credible as to the extent and duration of her impairments; found there was no period where Plaintiff was totally disabled for 12 consecutive months or more; and concluded that Plaintiff "ha[d] not been under a 'disability,' as defined in the Social Security Act, from December 3, 2003 through the date of this decision" (R. 20). The

undersigned finds that substantial evidence does not support the ALJ's determination, when viewed along with the new evidence. The undersigned in particular finds that substantial evidence does not support the ALJ's determination at Step Two, regarding Plaintiff's severe impairments, because the new evidence shows that her hip impairment was not an "aneurysmal bone cyst, status post surgery, with residual pelvic floor instability and pain," but was instead an aneurysmal bone cyst, status post surgery, that had gone on to ununited stress fracture left pubis.

Because substantial evidence does not support the finding at Step Two, it follows that it does not support the subsequent findings at Steps Three, Four or Five, in particular, but not limited to, the ALJ's RFC and credibility findings.

In addition, the undersigned finds the ALJ erred by not discussing or even mentioning Plaintiff's depression. Plaintiff was found by her treating physicians to have depression, at varying levels, during the relevant time period. 20 CRF § 404.1520a provides for a special technique to be used in evaluating mental impairments:

> (b) *Use of the technique.* (1) Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). See §404.1508 for more information about what is needed to show a medically determinable impairment. If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.
>
> (2) We must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section.
>
> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and

available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

(d) *Use of the technique to evaluate mental impairments.* After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

(1) If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see §404.1521).

(2) If your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. We will record the presence or absence of the criteria and the rating of the degree of functional limitation on a standard document at the initial and reconsideration levels of the administrative review process, or in the decision at the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision). See paragraph (e) of this section.

(3) If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.

(e) *Documenting application of the technique.* At the initial and reconsideration levels of the administrative review process, we will complete a standard document to record how we applied the technique. <u>At the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision), we will document application of the technique in the decision.</u>

. . . .

(2) At the administrative law judge hearing and Appeals Council levels, <u>the written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique.</u> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

(3) If the administrative law judge requires the services of a medical expert to assist in applying the technique but such services are unavailable, the administrative law judge may return the case to the State agency or the appropriate Federal component, using the rules in §404.941, for completion of the standard document. If, after reviewing the case file and completing the standard document, the State agency or Federal component concludes that a determination favorable to you is warranted, it will process the case using the rules found in §404.941(d) or (e). If, after reviewing the case file and completing the standard document, the State agency or Federal component concludes that a determination favorable to you is not warranted, it will send the completed standard document and the case to the administrative law judge for further proceedings and a decision.

(Emphasis added).

In this case, Plaintiff was diagnosed with depression and was prescribed medications for depression. In January, 2005, a State agency reviewing psychologist found Plaintiff had depression in partial remission. He opined, however, that she would have no functional limitations due to depression, and, in fact, found she had no severe mental impairment. Subsequent to that opinion, Plaintiff was taking Effexor for depression in April 2005. That June, she was "somewhat

depressed." In August 2005, her treating physician started her on Elavil to help her sleep, in the hope she would be relieved of some of her pain and "hopefully her depression will be abated."

Although Plaintiff's depression may not cause any functional limitations, the undersigned cannot find that substantial evidence supports the ALJ's complete omission of the alleged impairment.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence does not support ALJ Cannon's determination that Plaintiff was not disabled from December 3, 2003 through the date of her decision on July 19, 2006.

## VI. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment [Docket entry 10] be **DENIED,** and Plaintiff's Motion for Summary Judgment [Docket Entry 9] be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation. The undersigned makes no recommendation regarding Plaintiff's request for any further hearings to be in front of a different ALJ.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and

Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 22 day of January, 2008.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE